**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1217-24

A.C.,[1]

    Plaintiff-Respondent,

v.

R.S.,

    Defendant-Appellant.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **December 1, 2025** |
| **APPELLATE DIVISION** |

    Submitted November 20, 2025 – Decided December 1, 2025

    Before Judges Mawla, Marczyk, and Puglisi.

    On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0987-25.

    Einhorn, Barbarito, Frost, Botwinick, Nunn & Musmanno, PC, attorneys for appellant (Matheu D. Nunn, Steven H. Wolff, and Linda Torosian, on the briefs).

    A.C., self-represented respondent.

The opinion of the court was delivered by

MAWLA, P.J.A.D.

---

[1] We use the parties' initials pursuant to Rule 1:38-3(a)(1).

Defendant R.S. appeals from a November 22, 2024 final protective order (FPO) entered against her and in favor of plaintiff A.C., pursuant to the Victim's Assistance and Survivor Protection Act (VASPA), N.J.S.A. 2C:14-13 to -21. We reverse for the reasons expressed in this opinion.

Plaintiff filed a complaint alleging defendant committed stalking and cyber-harassment. She obtained a temporary protective order against defendant because of an incident, which occurred outside a home plaintiff shares with her young children, on November 10, 2024.

By way of background, the parties do not know each other. However, plaintiff was in a romantic relationship with defendant's husband. Defendant and her husband were in divorce proceedings when the incident occurred.

Defendant appeared at plaintiff's residence at approximately 12:30 a.m. and began ringing the doorbell. Plaintiff initially ignored the doorbell, but then she heard loud banging on her living room window and a woman's voice say: "Come outside, [plaintiff's first name]." Plaintiff did not recognize the voice, but defendant's husband, who was staying with plaintiff, did. He looked out of the window, recognized his wife, and went outside to urge her to leave plaintiff out of the dispute. Defendant's husband then left the scene, but defendant remained because she wanted plaintiff to come outside. Plaintiff did not oblige.

Defendant remained outside of plaintiff's house, "yell[ing] and caus[ing] a scene." Plaintiff testified defendant recounted facts about her, including that she resided in a one-room apartment, had children, referenced plaintiff's age, and knew plaintiff was "a former officer." Since defendant would not leave, plaintiff contacted the police, who met defendant outside of plaintiff's home. Officers then met with plaintiff, and she requested a domestic violence restraining order, but she did not qualify for one. Defendant left after officers spoke with her.

Around 2:00 a.m., plaintiff began receiving text messages in a group, which included her, defendant, and defendant's husband. Plaintiff did not previously give defendant her phone number. Defendant sent ten messages, including the following:

> You called the cops on the mother of your married man's [c]hildren as though I was going to do anything other than talk. Your married boyfriend should've told you how SMART I AM! The relationship between y'all isn't new! The good girl imag[e] you portrayed at the jail and the good boy image MY HUSBAND portrays is FAKE and I'm going to EXPOSE Y'ALL to ECDOC!!

Plaintiff explained the ECDOC was the Essex County Department of Corrections.

A-1217-24

Defendant's text continued: "Have fun [husband's name] with a person THAT[']S NOT ON MY LEVEL. But that's exactly what he needs[,] a weakling[,] because I'm WAY TO[O] STRONG FOR HIM!! I MADE HIM!"

Plaintiff testified she did not respond to the messages. Defendant then sent a copy of a voice message plaintiff had left for the husband stating she loved him. She followed the text containing the voice message with the following: "DESPERATE AND PATHETIC! You'll NEVER BE AROUND MY KIDS! Have fun in hiding! Lame as hell."

At this point the husband responded, asking defendant to leave plaintiff alone and explaining their relationship did not begin until after defendant filed for divorce. Defendant responded the husband was lying and then stated: "IT[']S ON!" Plaintiff testified she interpreted this text as a threat.

Defendant then sent another text stating: "It's going to ECDOC AND HER CURRENT JOB!!!" Plaintiff testified she interpreted this text as "a threat to continue to harass" because she stopped working for the ECDOC nine years prior, and now defendant was going to go to her current employer.

The text continued as follows: "MR. MARRIED MAN THAT DIDN[']T WANT TO MOVE OUT! And the fact that she really thinks I can't have you eating my pu**y and licking my bu** hole right now if I wanted to is

4

A-1217-24

COMICAL!!!! And she's COMICAL!!!" Defendant followed this text with a screenshot of plaintiff's Facebook profile picture.

After defendant's husband urged her to stop, she followed up with another text, which showed she knew plaintiff had children and the husband visited plaintiff when her children were not present. Plaintiff reiterated she did not know defendant or how defendant knew she had children. Defendant's knowledge of "the comings and goings of" plaintiff's children was "beyond concerning."

According to plaintiff, defendant also visited "and spoke to the children[ and] the father of [her] children," which she knew because the father emailed her about defendant's visit on November 10. Plaintiff had "no idea" how defendant knew where she formerly resided.

When the trial judge asked plaintiff why she needed an FPO, she responded: "This is very concerning. I do not want this type of erratic behavior and safety risk around my children. . . . It's troubling. It's dangerous. I have the right to protect myself and my children, and . . . one of the ways for that to happen is by having a [FPO]."

Defendant testified she obtained plaintiff's information from the voicemail plaintiff left her husband. She then searched for plaintiff's addresses and visited them. Defendant testified she was upset her husband was seeing

another woman. She conceded he began seeing plaintiff two months after the complaint for divorce was filed, but she was upset and went to plaintiff's home because the divorce was not final.

Defendant testified she left after she encountered the police who told her plaintiff did not want her trespassing. She then went to her car and began sending the text messages. Defendant claimed she knew facts about plaintiff because the father of plaintiff's children worked with defendant's husband, and she spoke with him.

Defendant denied she was going to appear at plaintiff's job. She intended only to call plaintiff's employer because she did not "think it's right that she's sleeping with a married man and . . . she doesn't understand [defendant's] frustration."

Following the testimony, the trial judge gave her opinion. She concluded both parties were credible and found plaintiff did not prove stalking because there was only one incident, which did not meet the statute's requirement of repeated conduct. N.J.S.A. 2C:12-10.

However, the judge found plaintiff proved defendant committed cyber-harassment when she sent the text threatening to contact the ECDOC and plaintiff's new employer. The threat to go to the employer was a threat of harm to plaintiff's property. The judge also found defendant's text regarding

6

her husband performing oral sex on defendant was a lewd comment directed at plaintiff "for the purposes of harassment." She concluded there was no purpose for either communication other than to harass. Plaintiff also met the burden of proof because the texts were made at 2:00 a.m., which was "not a time when people should be communicating if you have any purpose other than harassing." Defendant intended to harass plaintiff because, rather than leave after her encounter with the police, she stayed and sent the texts. The intent to harass was further demonstrated by going to the home where the father of plaintiff's children resided.

I.

In VASPA cases, the Supreme Court has stated our standard of review is as follows:

> We defer to a trial court's factual findings "when supported by adequate, substantial, credible evidence." [Cesare v.]Cesare, 154 N.J. [394,] 411-12 (1998). "That deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare, 154 N.J. at 412). . . .

> We review questions of statutory interpretation de novo, owing no deference to the legal conclusions of the trial court . . . . State v. Fuqua, 234 N.J. 583, 591 (2018).

> In cases of statutory interpretation, we start with "the statutory language." DiProspero v. Penn, 183

N.J. 477, 492 (2005). "We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citation omitted). "[W]hen the language of a statute is clear on its face," our "sole function . . . is to enforce it according to its terms." Cashin v. Bello, 223 N.J. 328, 335 (2015) (alteration in original) (quoting Hubbard v. Reed, 168 N.J. 387, 392 (2001)).

[C.R. v. M.T., 257 N.J. 126, 139-40 (2024).]

## II.

Defendant argues the finding of cyber-harassment was erroneous because her communications were not made online or through social media and, therefore, an SMS[2] text communication cannot be considered cyber-harassment. There was no cyber-harassment because she did not threaten physical harm to plaintiff's person or property when she threatened to go to her employer. She also claims she did not send lewd, indecent, or obscene material to or about plaintiff with the intent to harm her or put her in fear of harm. Unlike the harassment statute, N.J.S.A. 2C:33-4(a), defendant asserts the trial judge's findings there was an intent to harass because the texts were sent at 2:00 a.m. were erroneous because the cyber-harassment statute does not criminalize communications depending on the time they are sent. Defendant argues the trial judge made no findings regarding the possibility of future risk

---

[2] Short messaging service.

8

to the safety or well-being of plaintiff required under VASPA to grant an FPO. We address these arguments in turn.

VASPA permits "[a]ny person alleging to be a victim of . . . lewdness, or any attempt at such conduct, or stalking or cyber-harassment, and who is not eligible for a restraining order" pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, to seek a protective order. N.J.S.A. 2C:14-14(a)(1). The statute defines lewdness as "the exposing of the genitals for the purpose of arousing or gratifying the sexual desire of the actor or of any other person." Ibid. Cyber-harassment is defined as

> conduct that occurs, while making one or more communications in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, that involves: threatening to inflict injury or physical harm to any person or the property of any person; knowingly sending, posting, commenting, requesting, suggesting, or proposing any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to the reasonable person; or threatening to commit any crime against a person or the person's property.
>
> [Ibid.]

We are constrained to reverse the trial judge's finding defendant violated VASPA by engaging in lewdness. The facts do not establish defendant engaged in any conduct that would be considered an "exposing of the genitals

for the purpose of arousing or gratifying" defendant's, or any other person's, sexual desire. At best, defendant was bragging about her sexual prowess in the text messages.

We reject defendant's assertion a text message cannot be considered an online communication under VASPA. At the outset, we reiterate the Legislature clearly intended VASPA to include individuals who are victims of the offenses enumerated in the statute but could not be protected by the PDVA. N.J.S.A. 2C:14-14(a); see also R.L.U. v. J.P., 457 N.J. Super. 129, 135 (App. Div. 2018) (discussing how "[V]ASPA was intended to fill th[e] void" left by the PDVA). In C.R., the Court observed "[a]s a complement to the PDVA, [V]ASPA mirrors the PDVA in certain respects, and diverges from it in others." 257 N.J. at 143. The Court then detailed the many similarities and some differences between the statutes, which we need not repeat here. Id. at 143-47.

For purposes of our discussion, we have stated the Legislature intended the PDVA to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)). Given the complementary relationship between the PDVA and VASPA, we interpret VASPA like the PDVA to provide maximum protection

to victims.  To that end, we construe the online element of cyber-harassment under VASPA to include text messages.

Text messages can be transmitted in three forms, namely, SMS, MMS (multimedia messaging service), and RCS (rich communications service). Compare What is the Difference Between iMessage, RCS, and SMS/MMS?, Apple (Mar. 20, 2025), https://support.apple.com/en-us/104972, with Google, Send & Receive Text Messages (SMS, MMS, & RCS), Google Fi Wireless Help, https://support.google.com/fi/answer/6205096?hl=en&co=GENIE.Platfo rm%3DAndroid (last visited Nov. 18, 2025).

A device is "online" if it is "connected to the Internet or other network." Online, The L. Dictionary, https://thelawdictionary.org/online/ (last visited Nov. 18, 2025).  Although an SMS text typically uses a traditional cellular network rather than the internet, an SMS text can be transmitted online.  See Google, Check Your Messages On Your Computer or Android Tablet, Google Messages, https://support.google.com/messages/answer/7611075?hl=en (last visited Nov. 18, 2025) ("Google Messages for web sends SMS messages using a connection from your computer to your phone . . . ."); What is SMS?, Lenovo, https://www.lenovo.com/us/en/glossary/what-is-sms/ (last visited Nov. 18, 2025).  For these reasons, we are satisfied defendant made an online communication.  To conclude otherwise we would ignore the dual modality of

11

SMS messaging, including messaging applications, and we would carve out a popular form of messaging[3] from the ambit of VASPA, which we do not believe the Legislature intended.

We are also convinced defendant's statement, she would go to the ECDOC and plaintiff's new employer, targeted plaintiff's property. Long ago, our Supreme Court said: "A calling, business or profession, chosen and followed, is property." State v. Chapman, 69 N.J.L. 464, 466 (1903). We have upheld the entry of a restraining order on harassment grounds under the PDVA where a defendant threatened to send lewd pictures of the plaintiff to her employer. McGowan v. O'Rourke, 391 N.J. Super. 502, 504, 506 (App. Div. 2007).

Our difficulty here is that defendant's statement she would contact the ECDOC and plaintiff's employer did not qualify as cyber-harassment because it did not threaten to inflict any injury or harm, let alone threaten to commit a crime, affecting plaintiff's job. We might be convinced defendant committed cyber-harassment if, as happened in McGowan, defendant threatened to

---

[3] "Text messaging is the most widely-used smartphone feature . . . ." Aaron Smith, U.S. Smartphone Use in 2015, Pew Research Center (Apr. 1, 2015), https://www.pewresearch.org/internet/2015/04/01/us-smartphone-use-in-2015/. SMS texting is universally compatible with "virtually all mobile devices." Amazon, What is SMS?, AWS, https://aws.amazon.com/what-is/sms/ (last visited Nov. 18, 2025).

12

communicate with the employers by providing them with false or illicit information injurious to plaintiff. That did not happen here. The record shows defendant intended to inform the employers about plaintiff's relationship with her husband. This was neither a crime nor the sort of injury VASPA intended to prevent.

Finally, because we have concluded plaintiff did not establish a predicate act under VASPA, we need not reach defendant's arguments regarding the judge's findings related to the timing of the text communications. We also do not reach the argument concerning the lack of findings regarding the possibility of future risk to plaintiff's safety.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-1217-24